**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; GRAND CANYON TRUST; SIERRA CLUB; KAIBAB BAND OF PAIUTE INDIANS; HAVASUPAI TRIBE, *Plaintiffs-Appellants*, | No. 11-17843 D.C. No. 3:09-cv-08207-DGC |
| v. | OPINION |
| KEN SALAZAR, Secretary of the Interior; UNITED STATES BUREAU OF LAND MANAGEMENT, *Defendants-Appellees*, | |
| and | |
| DENISON ARIZONA STRIP, LLC; DENISON MINES (USA) CORP., *Intervenor-Defendants-Appellees*. | |

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted
October 18, 2012—San Francisco, California

Filed February 4, 2013

Before: J. Clifford Wallace and Carlos T. Bea,
Circuit Judges, and Jane A. Restani, Judge.[*]

Opinion by Judge Wallace

**SUMMARY**[**]

**Mining Law**

The panel affirmed the district court's judgment in favor of the Secretary of the Interior and the U.S. Bureau of Land Management in an action challenging the decision to allow Denison Mines Corp. to restart mining operations at the Arizona 1 Mine.

As a threshold issue, the panel held that a decision made by a prior panel of this court affirming the district court's denial of appellants' preliminary injunction motion did not become law of the case as to any issue. The panel held that the Bureau of Land Management did not violate the National Environmental Policy Act, the Federal Land Policy and

---

[*] The Honorable Jane A. Restani, Judge for the U.S. Court of International Trade, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Management Act, and BLM's own regulations, by permitting Denison Mines to restart mining operations under a plan of operations that BLM approved in 1988. The panel also held that BLM's update of the Arizona 1 Mine reclamation bond should not be set aside. Finally, the panel held that BLM's application of the categorical exclusion for issuance of the Robinson Wash gravel permit was not arbitrary and capricious or otherwise not in accordance with law.

## COUNSEL

Neil Levine (argued), Grand Canyon Trust, Denver, Colorado; Amy Rae Atwood, Center for Biological Diversity, Portland, Oregon; Roger Flynn, Western Mining Action Project, Lyons, Colorado, for Appellants.

Ignacia S. Moreno, Mark R. Haag (argued), Environmental & Natural Resources Division, United States Department of Justice, Washington, D.C.; John L. Gaudio, United States Department of the Interior, Office of the Solicitor, Phoenix, Arizona, for Federal Appellees.

Michael K. Kennedy (argued), Bradley J. Glass, David J. DePippo, Gallagher & Kennedy, P.A., Phoenix, Arizona, for Intervenor-Appellees.

## OPINION

WALLACE, Senior Circuit Judge:

Appellants Center for Biological Diversity, Grand Canyon Trust, Sierra Club, Kaibab Band of Paiute Indians,

and Havasupai Tribe contend that Appellees Ken Salazar, Secretary of the Interior, and the U.S. Bureau of Land Management (collectively, BLM) violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 *et seq.*, and its own regulations, 43 C.F.R. § 3809, *et seq.*, by permitting Denison Mines Corp. and Denison Arizona Strip, LLC (collectively, Denison) to restart mining operations at the Arizona 1 Mine in 2009, after a seventeen-year hiatus, under a plan of operations that BLM approved in 1988. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I.

The Arizona 1 Mine is a uranium mine located in Mohave County, Arizona, thirty-five miles southwest of Fredonia, Arizona, and six and one-half miles north of Grand Canyon National Park. The history of the mine goes back nearly three decades. In 1984, Energy Fuels Nuclear, Inc. submitted to BLM a plan for uranium exploration activities on mining claims it owned in Mohave County, Arizona. On October 4, 1984, BLM approved the exploration plan. Four years later, in 1988, Energy Fuels submitted to BLM a plan of operations to develop and operate a portion of its mining claims as the Arizona 1 Mine.

BLM reviewed the proposed plan of operations, took into account public sentiment, and prepared an environmental assessment of the mining activities' impact. After a detailed review, on May 9, 1988, BLM approved the plan, determining that the proposed mining operations at the Arizona 1 Mine would not "cause any undue or unnecessary degradation of public lands" or "significantly affect the

quality of the human environment." The plan of operations complied with the regulations found in 43 C.F.R. § 3809 (the section 3809 regulations) then in effect. Important here, the plan of operations contained a portion governing the interim management of the Arizona 1 Mine "in the event of an 'extended period of non-operation before mining is completed.'" Such a shutdown, the interim management portion of the plan stated, was, though unanticipated, a "possibility."

Once the plan of operations was approved, Energy Fuels actively developed the Arizona 1 Mine until a severe drop in uranium prices made mining at the site economically unjustifiable. As a result, Energy Fuels ceased mining activities at the Arizona 1 Mine in 1992 and placed the mine on "standby and interim management status." In May 1997, while mining operations remained on hold, International Uranium Corporation, USA, acquired the Arizona 1 Mine. In 2007, International Uranium merged with Denison.

During the period following the cessation of mining activities at the Arizona 1 Mine, Energy Fuels, International Uranium, and later Denison, followed the interim management portion of the 1988 plan of operations. Among other things, the companies maintained buildings, mine shafts, gates, fences, and signage for the mine. The companies also maintained a surety bond for reclamation and paid utilities, property taxes, BLM maintenance fees, and insurance premiums. Additionally, the companies sent employees and contractors to the mine to ensure that the mine complied with the 1988 plan of operations. Likewise, throughout the interim period, BLM conducted field inspections at the Arizona 1 Mine, which consisted primarily

of perimeter inspections as the mine gate remained locked during the interim period.

In 2007, Denison advised BLM of its intention to restart mining operations at the Arizona 1 Mine. In preparation for the recommencement of mining operations, Denison obtained current Aquifer Protection and Air Quality Control permits from the State of Arizona. Additionally, Denison updated its financial guarantee with the Arizona Department of Environmental Equality and the BLM. To update its financial guarantee, BLM asked Denison to submit a revised reclamation bond estimate, in accordance with a 2000 regulation amending the level of financial guarantee required, *see* 43 C.F.R. § 3809.505, to cover the reclamation costs outlined in the 1988 plan of operations. Denison submitted a revised bond estimate to BLM. BLM checked that figure using its cost-estimation software and concluded that Denison had overestimated the amount of bond necessary. BLM accepted Denison's overestimate, requiring a bond of $377,800.

Denison also obtained a "Permit to Use Right-of-Way" from Mohave County to perform needed improvements and maintenance on Mount Trumbull Road, itself a right-of-way that BLM had granted Mohave County some years earlier. Mount Trumbull Road provides Denison employees access to the Arizona 1 Mine and is therefore important to the mine's operation. The road also provides the public access to recreation areas in the region. Prior to Mohave County appointing Denison as its agent to maintain the Mount Trumbull Road, the County obtained a "Free Use Permit"—at Denison's urging—to extract a certain amount of gravel from the Robinson Wash to maintain the Mount Trumbull Road. BLM determined that issuance of the gravel permit fell within

a categorical exclusion to NEPA and determined that "no extraordinary circumstances potentially having effects that may significantly affect the environment" existed meriting more exhaustive environmental analysis. Accordingly, no further NEPA analysis took place before BLM issued the "Free Use Permit" to Mohave County. With these measures taken, Denison resumed mining operations in December 2009.

Before mining resumed in full, in November 2009, Appellants filed their initial complaint against BLM, arguing that Denison could not begin operations under the 1988 plan of operations because the seventeen-year cessation of mining activities rendered that plan ineffective. Months later, in April 2010, Appellants moved for a preliminary injunction to prevent Denison from operating the Arizona 1 Mine. The district court denied the motion for preliminary injunction, holding that the 1988 plan of operations had not become ineffective and that BLM did not have to prepare a supplemental NEPA analysis prior to Denison recommencing mining operations. *Center for Biological Diversity v. Salazar*, No. CV-09-8207-PCT-DGC, 2010 WL 2493988 (D. Ariz. June 17, 2010). Appellants appealed from the denial of their preliminary injunction. A panel of this court affirmed the district court's denial of the preliminary injunction in an unpublished memorandum disposition. *Center for Biological Diversity v. Salazar*, 431 F. App'x. 593 (9th Cir. 2011).

After further proceedings in the district court, both parties moved for summary judgment. The district court granted summary judgment in favor of Appellees as to all of Appellants' claims, with one exception. The district court determined that BLM "provided no more than a 'cursory statement' of no cumulatively significant impacts in applying

the categorical exclusion" when issuing Mohave County the "Free Use Permit" to remove gravel from Robinson Wash and remanded the issue to the BLM. A short time later, BLM provided further explanation as to its use of the categorical exclusion. The district court found that BLM had presented a rational explanation for its use of the categorical exclusion. Accordingly, the district court concluded that use of the categorical exclusion as to the gravel permit was not arbitrary and capricious. The district court thus granted summary judgment on the categorical exclusion issue in favor of Appellees. Appellants now appeal the district court's two summary judgments.

## II.

We review summary judgment de novo, "applying the same standards that applied in the district court." *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006). Under the Administrative Procedure Act, we review actions of the BLM pursuant to FLPMA and NEPA to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)(A)). We defer to BLM's "interpretation of its own regulations . . . unless plainly erroneous or inconsistent with the regulations being interpreted." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007) (internal quotation marks omitted).

## III.

We first address Appellees' threshold question of whether this court's decision made by a prior panel affirming the district court's denial of Appellants' preliminary injunction motion became law of the case as to any issue. Appellees, and

in particular Denison, argue that this prior affirmance works as law of the case and thereby prevents Appellants from arguing that the 1988 plan of operations is ineffective and that if the plan is not ineffective, BLM should have supplemented the 1988 environmental analysis BLM performed in connection with its approval of that plan.

The law of the case doctrine holds that "a court will generally refuse to reconsider an issue that has already been decided by the same court or a higher court in the same case." *Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc), *cert. granted*, 133 S. Ct. 476 (2012). In general, however, "our decisions at the preliminary injunction phase do not constitute the law of the case." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1114 (9th Cir. 2007). This is true for the reason that a preliminary injunction decision is just that: preliminary. *Id.* "This rule acknowledges that 'decisions on preliminary injunctions . . . must often be made hastily and on less than a full record.'" *Id.* (quoting *S. Or. Barter Fair v. Jackson Cnty.*, 372 F.3d 1128, 1136 (9th Cir. 2004)).

We have repeatedly emphasized the preliminary nature of preliminary injunction appeals. In *Sports Form, Inc. v. United Press International, Inc.*, 686 F.2d 750 (9th Cir. 1982), we explained that "[b]ecause of the limited scope of our review of the law applied by the district court and because the fully developed factual record may be materially different from that initially before the district court, our disposition of appeals from most preliminary injunctions may provide little guidance as to the appropriate disposition on the merits." *Id.* at 753; *see also Melendres v. Arpaio*, 695 F.3d 990, 1003 (9th Cir. 2012).

In the case before us, the prior panel's complete decision states:

> In this interlocutory appeal, Appellants challenge the district court's denial of their motion for a preliminary injunction. Reviewing for abuse of discretion, we affirm for the reasons stated by the district court judge. Appellants failed to raise serious questions on the merits of their claims of violations of the National Environmental Policy Act, and the Federal Land Policy Management Act.

*Center for Biological Diversity*, 431 F. App'x. at 593 (citations omitted).

This decision did not become law of the case as to any issues presently before us on appeal. The prior panel's statement that it was affirming "for the reasons stated by the district court" is not a clear determination of the meaning of the statutes and regulations relevant to this case. Indeed, the prior panel's short decision is a far cry from the exception to our rule and those preliminary injunction decisions that become law of the case as to pure questions of law. *See, e.g.*, *Humanitarian Law Project v. U.S. Dep't of Justice*, 352 F.3d 382, 393 (9th Cir. 2003) (holding that four issues decided on appeal from a preliminary injunction decision were considered in full and resolved as matters of law and thus, the law of the case doctrine prevented further review of that issue in a subsequent appeal), *vacated on other grounds by* 393 F.3d 902 (9th Cir. 2004); *see also Ranchers Cattlemen*, 499 F.3d at 1114 ("A *fully considered* appellate ruling on an issue of law made on a preliminary injunction appeal . . . become[s]

the law of the case for further proceedings in the trial court on remand and in any subsequent appeal") (emphasis added). But even such a result assumes that the factual record would not materially change after a trial such that the law declared at the preliminary stage is no longer relevant to the different post-trial finding of facts. *See Sportsform*, 685 F.2d at 753*; Ranchers Cattlemen*, 499 F.3d at 1114; *S. Or. Barter Fair*, 372 F.3d at 1136. This becomes relevant here when we focus on the prior panel's order.

The prior panel's statement that "Appellants failed to raise serious questions on the merits" is not necessarily a definitive conclusion as to any legal or factual question raised in the preliminary injunction appeal and appears to be a statement that the facts *as then presented* did not raise a serious claim according the prior panel's "limited" review of the law. *See Sports Form*, 686 F.2d at 753. This left open the possibility that additional facts could be introduced during the further district court proceedings resulting in a different outcome based on a full evidentiary record and a complete review of the legal principles. As a result, we conclude that the prior panel did not intend that its brief affirmation of the preliminary injunction denial become law of the case. We thus proceed to the merits of Appellants' claims.

## IV.

Appellants' chief contention is that the Arizona 1 Mine's 1988 plan of operations became "ineffective" after the mine closed in the early 1990s, thereby necessitating BLM approval of a new plan of operations before mining could recommence in 2009. In support of their contention that the cessation of mining activities rendered the 1988 plan of operations ineffective, Appellants rely on 43 C.F.R.

§ 3809.423, which provides that an operator's "plan of operations remains in effect as long as [the operator is] conducting operations, unless BLM suspends or revokes [the] plan of operations." Under Appellants' reading of this regulation, because Energy Fuels stopped "conducting operations," BLM had to approve a new plan of operations before Denison could resume mining at the Arizona 1 Mine. Appellants thus conclude that BLM violated 43 C.F.R. § 3809.11 by allowing Denison to mine without having an effective plan of operations and that BLM thereby failed to comply with its duty under the FLPMA to ensure that the Arizona 1 Mine does not cause "unnecessary or undue degradation." 43 U.S.C. § 1732(b); *see also* 43 C.F.R. § 3809.1.

When viewed in isolation, section 3809.423 appears to have rendered the 1988 plan of operations ineffective by reason of Energy Fuels' cessation of activities in 1992. Nevertheless, we agree with the district court that we must "interpret [a] regulation as a whole, in light of the overall statutory and regulatory scheme, and not [] give force to one phrase in isolation." *Norfolk Energy, Inc. v. Hodel*, 898 F.2d 1435, 1442 (9th Cir. 1990) (internal quotation marks omitted); *see also Alaska Trojan P'ship v. Gutierrez*, 425 F.3d 620, 628 (9th Cir. 2005). Upon reading the regulations as a whole, it is clear, as BLM contends, that section 3809.423 does not mean that a temporary closure of a mine immediately results in an ineffective plan of operations.

To begin, the section 3809 regulations expressly provide for periods of temporary cessation of mining activities. Each mining plan of operations must contain a portion outlining an "interim management plan" that governs during "periods of temporary closure." 43 C.F.R. § 3809.401(b)(5). Section

3809.424(a)(1) provides that if a mine operator "stop[s] conducting operations for any period of time" it must "follow [the] approved interim management plan." As the district court explained, provisions requiring that an interim management plan govern during periods of temporary closure would be superfluous if a plan of operations was rendered ineffective as soon as mining operations ceased. Additionally, section 3809.424(a)(3) provides that after five years of inactivity, "BLM will review [the] operations and determine whether BLM should terminate [the] plan of operations and direct final reclamation and closure." Likewise, section 3809.424(a)(4), provides that BLM may determine that an operator has abandoned mining operations and initiate forfeiture of reclamation costs. These mechanisms, by which BLM can terminate a plan of operations after five years of inactivity or after abandonment, would be meaningless if a plan of operations automatically became ineffective upon temporary cessation of mining activities. We agree with the district court that "[t]he obvious import of these provisions is that a plan of operations remains effective for periods of operation before and after temporary closures, with such closures being governed by the interim management portion of the plan unless BLM elects to terminate the plan" early. *Center for Biological Diversity v. Salazar*, 791 F. Supp. 2d 687, 693 (D. Ariz. 2011).

Appellants contend that this reading of the applicable regulations—under which Denison is permitted to restart mining activities despite years of inactivity—renders section 3809.423's plain language meaningless. Appellants argue that sections 3809.423 and 3809.424 should be read instead, as the district court put it, to reflect a "step-down process" in the ultimate winding down of mining operations. Under Appellants' theory, section 3809.423 provides that inactivity

renders the plan of operations ineffective. When a plan of operations becomes ineffective, Appellants maintain, the interim plan described in section 3809.424(a)(1) takes effect. That interim plan governs until, after five years of inactivity, BLM reviews a mine's operations and determines whether to terminate the interim management plan and "direct final reclamation and closure." *Id.* § 3809.424(a)(3). Under Appellants' theory, a new plan of operations would be required before new mining activities could begin.

Nevertheless—and unfortunately for Appellants—the applicable regulations do not actually provide for such a scheme. While the regulations provide for temporary closures and identify what a mine operator must do when it "stop[s] conducting operations," *id.* § 3809.424, no regulation requires approval of a new plan of operations before regular mining activities may recommence following a temporary closure. If, as appellants contend, the regulations provided for a "step-down" process and required approval of a new plan of operations before mining could restart following any temporary cessation of mining activities, one would expect them to do so clearly. They do not.

Further, if, as Appellants contend, a temporary closure of a mine immediately rendered a plan of operations ineffective, section 3809.424(a)(3)'s provision permitting BLM to terminate a plan of operations would be unnecessary. Appellants argue that section 3809.424(a)(3) refers to termination of the interim management portion of the plan of operations and thus, section 3809.424(a)(3) is not superfluous. Section 3809.423 does not, however, distinguish or exclude the interim portion of the management plan from its blanket statement that a plan of operations  is "in effect as long as [the operator] is conducting operations." *See also id.*

§ 3809.401. As a result, if Appellants are correct and a plan of operations becomes immediately ineffective once mining operations temporarily cease, then the interim management portion of the plan would likewise become ineffective. Under section 3809.424(a)(3), then, there would be nothing left to terminate. That section would thus have no meaning. Accordingly, there is no support for Appellants' reading of section 3809.423 in the language of the applicable regulations.

BLM's interpretation of section 3809.423 is also consistent with BLM's statements when it promulgated the current regulations. BLM explained that "[section] 3809.423 provides that the plan of operations approval is good for the life of the project as described in the plan." 65 Fed. Reg. 69998, 70053 (Nov. 21, 2000). BLM recognized that the life of a mining project may include changes in mine ownership and temporary periods of mine closure. Indeed, BLM recognized that "an approved plan of operations has financial value to the owner/operator and can be transferred to another owner." *Id.* at 70054. Additionally, BLM acknowledged a commentor's statement that mining activities are "sensitive to world fluctuations of commodity prices, and may have to be discontinued when prices are not high enough to make the operation profitable." *Id.* at 70055. BLM explained that the "occurrence or length of these 'down times' . . . cannot be determined in advance." *Id.* From these statements, it is clear that BLM did not promulgate section 3809.423 to terminate a plan of operations immediately upon any disruption in mining activities—such as changes in mine ownership or temporary closures due to price fluctuations; rather, BLM rejected issuing plan of operations approvals "with limited periods of effectiveness," and opted instead for plans that are "good for the life of [a] project." *Id.* at 70053. Further, BLM

explained that section 3809.424 "define[s] conditions of temporary closure, and define[s] conditions under which temporary closure becomes permanent." *Id.* at 70054. Nowhere in these statements does BLM suggest that a new plan of operations is required before mining can be resumed after a temporary closure.

BLM's interpretation also harmonizes sections 3809.423 and 3809.424(a)(3). Contrary to Appellants' contention, BLM's interpretation recognizes that section 3809.423 permits a plan to remain in effect "as long as [the operator] is conducting operations." As the district court explained, "as long as" connotes "during the whole time that." *See Salazar*, 791 F. Supp. 2d at 695; *see generally* Oxford Dictionaries Online, http://oxforddictionaries.com (last visited Jan. 25, 2011). The whole time that a plan of operations is valid includes both active and non-active periods. Section 3809.424(a)(4) permits BLM to cut-short the time period of a plan of operations after five years of inactivity. Thus, under this plain reading of sections 3809.423 and 3809.424(a)(3), both provisions have meaning. *See Boeing Co. v. United States*, 258 F.3d 958, 967 (9th Cir. 2001) (explaining that a court must construe regulations so as to give effect to each provision).

Nothing about BLM's interpretation suggests that approved plans of operations may "continue in perpetuity" as Appellants fear. Plans of operations outline the life of a particular project. The life of a project necessarily has finite limits that are spelled out in the plan of operations. *See* 65 Fed. Reg. at 70053; *see also* § 43 C.F.R. 3809.401(b) (requiring plans of operations to contain numerous details "sufficient for BLM to determine that the plan of operations prevents unnecessary or undue degradation"). As explained,

BLM has several mechanisms to cut short a plan of operation—particularly where there are long periods of inactivity. *See id.* 43 C.F.R. §§ 3809.424(a)(3), (4), 3809.602(a). BLM also has the ability to require a modification to a plan of operations where new concerns as to unnecessary and undue degradation arise. *Id.* § 3809.431(b). Although BLM failed to cut-short or modify the 1988 plan of operations, that plan remains bounded by its own terms and is still subject to future actions by BLM to cut-short or modify the plan, if appropriate. Under BLM's interpretation, then, neither the Arizona 1 Mine plan nor plans generally remain effective indefinitely.

In sum, because the section 3809 regulations provide for temporary suspension of mining activities and because BLM's interpretation of section 3809.423 is consistent with both the section 3809 regulations when read as a whole and BLM's expressed intent in promulgating the section 3809 regulations, BLM's interpretation of the meaning of section 3809.423 is controlling. *See Long Island Care*, 551 U.S. at 171 ("[A]n agency's interpretation of its own regulations is controlling unless plainly erroneous or inconsistent with the regulations being interpreted") (internal quotation marks omitted). Accordingly, we conclude that BLM's decision to allow Denison to resume mining at the Arizona 1 Mine under the 1988 plan of operations was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## V.

Appellants next contend that BLM violated NEPA by failing to supplement the 1988 environmental assessment BLM conducted in connection with the approval of the 1988

plan of operations. Essentially, Appellants contend that the 1988 NEPA analysis became stale and outdated, necessitating supplemental review of the Arizona 1 Mine's environmental impact.

NEPA requires that federal agencies perform environmental analysis before taking any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Thus, whether NEPA is triggered depends on whether there is a new, proposed "major Federal action." *See* 40 C.F.R. § 1502.5 (providing that the timing for an environmental impact statement under NEPA is during the proposal stage). Supplementation of a prior NEPA environmental analysis is only required where "there remains major Federal action to occur." *Norton v. S. Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 73 (2004) (internal quotation marks omitted); *see also* 40 C.F.R. § 1502.9(c)(1)(i)-(ii) (providing that agencies must prepare supplements to an environmental impact statement if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns" or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts"); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 374 (1989) (whether supplementation should occur "turns on the value of the new information to the *still pending* decisionmaking process . . . and if the new information is sufficient to show that the remaining action will affec[t] the quality of the human environment in a significant manner or to a significant extent not already considered") (emphasis added) (internal quotation marks omitted).

Undoubtedly, the approval of the 1988 plan of operation was a "major federal action" triggering NEPA's

requirements. *See SUWA*, 542 U.S. at 73. Nevertheless, as in *SUWA*, "that action [wa]s completed when the plan [wa]s approved." *Id.*; *see also Cold Moutain v. Garber*, 375 F.3d 884, 894 (9th Cir. 2004). Before that action was complete, BLM performed the requisite environmental analysis. Accordingly, as far as the 1988 plan of operations is concerned, appropriate NEPA review took place and "[t]here is no ongoing 'major Federal action' that could require supplementation," *SUWA*, 542 U.S. at 75. *See Cold Mountain*, 375 F.3d at 894; *Greater Yellowstone Coal. v. Tidwell*, 572 F.3d 1115, 1122-23 (10th Cir. 2009).

Appellants argue, however, that BLM's issuance of a gravel permit to Mohave County, requirement that Denison obtain a new air quality control permit, and approval of an updated reclamation bond each constituted a prerequisite to mining and thus, "major Federal actions" triggering supplementation of the 1988 environmental analysis. While it is true that each of the above actions potentially constituted a "major Federal action" that would have required NEPA analysis—a question we address below as to the gravel permit and reclamation bond—none of those actions affected the validity or completeness of the 1988 approval of the Arizona 1 Mine's plan of operations nor did they prevent Denison from mining under that plan. These additional, independent actions thus did not trigger NEPA supplementation of the 1988 environmental analysis. In sum, "because the [1988 plan of operations] has been approved . . . [BLM's] obligation under NEPA has been fulfilled." *Cold Mountain*, 375 F.3d at 894. We thus conclude that BLM did not "unlawfully withh[o]ld" required agency action. *See* 5 U.S.C. § 706(1).

## VI.

Appellants next argue that BLM's approval of the updated reclamation bond triggered NEPA analysis as a "major Federal action." BLM's "[a]pproval of [a] specific project[]" may be a "major Federal action" requiring compliance with NEPA where it has "effects that may be major." 40 C.F.R. § 1508.18(b)(4). Here, Appellants contend that BLM's requirement that Denison update its financial bond constituted an approval necessary before Denison could take the Arizona 1 Mine off stand-by status. As such, Appellants argue that this approval triggers NEPA analysis.

While BLM required Denison to update its reclamation bond before recommencing mining operations, that action did not consist of an "[a]pproval of [a] specific project[]." *Id.* BLM approved the Arizona 1 Mine plan of operations in 1988. That plan, as explained above, has not been invalidated or modified since that time. It thus continues in effect and controls activities at the mine. The plan of operations contains a reclamation portion. As with the plan generally, the reclamation portion remains valid and has not been altered. It thus governs reclamation activities at the mine. In requiring an update to the reclamation bond, BLM merely reviewed the cost of reclamation based on the provisions of the 1988 plan of operations and determined, after "crunching some numbers," that the amount of the reclamation bond should be increased in accordance with newly-applicable regulations. *See* 43 C.F.R. § 3809.505 (requiring an updated reclamation bond for "each plan of operations approved before January 20, 2001"); *id.* § 3809.552(b) (providing that BLM "will periodically review the estimated cost of reclamation . . . and require increased coverage, if

necessary"). Thus, this action did not constitute approval of a specific project necessitating NEPA review.

On the contrary, BLM's update of the Arizona 1 Mine reclamation bond consisted of the ministerial tasks of feeding reclamation data from the 1988 plan into BLM's "SHERPA" software program, comparing SHERPA's reclamation estimate with that of Denison, and then accepting Denison's proposed bond amount, which was greater than BLM's SHERPA calculation. Such post-project-approval functions are the type of monitoring and compliance activities that this court has determined do not trigger NEPA's requirements. *See Sierra Club v. Penfold*, 857 F.2d 1307, 1314 (9th Cir. 1988); *San Francisco Tomorrow v. Romney*, 472 F.2d 1021, 1025 (9th Cir. 1973). Accordingly, BLM's update of the Arizona 1 Mine reclamation bond should not be set aside as "not in accordance with law" or "without observance of procedure required by law," as Appellants contend. 5 U.S.C. § 706(2)(A), (D).

## VII.

Appellants also challenge BLM's application of the categorical exclusion to its issuance of the Free Use Permit to Mohave County for extraction of gravel from the Robinson Wash. Categorical exclusions are classes of actions that an agency has determined do not "have a significant effect on the human environment." 40 C.F.R. § 1508.4. Application of a categorical exclusion is not an exemption from NEPA; rather, it is a form of NEPA compliance, albeit one that requires less than where an environmental impact statement or an environmental assessment is necessary. *Id.* Indeed, even where an action falls into a categorical exclusion, an agency must nevertheless provide procedures for determining

whether "extraordinary circumstances" exist, such that the action, though "normally excluded" from full NEPA analysis, "may have a significant environmental effect." *Id.*

Under its regulations, BLM has determined that extraction of gravel "in amounts not exceeding 50,000 cubic yards or disturbing more than 5 acres, except in riparian areas," is entitled to a categorical exclusion to full NEPA analysis. BLM NEPA Handbook Appx. 4, § F(10). Appellants do not challenge the establishment of this categorical exclusion; rather, Appellants contend that BLM unlawfully limited the scope of NEPA analysis in invoking this categorical exclusion by failing to analyze adequately "indirect" and "cumulative" impacts of the gravel permit, as well as the impact of "connected actions" under 40 C.F.R. § 1508.25.

Section 1508.25 provides that in "determin[ing] the scope of environmental impact statements," an agency must consider, among other things, "[c]onnected actions," and "indirect" and "cumulative" environmental "impacts" to the proposed action. By its plain language, however, this regulation applies only to environmental impact statements. *Id.* Appellants, in a footnote, contend that although section 1508.25 explicitly applies to environmental impact statements, it should also apply to all actions under NEPA, including the application of a categorical exclusion.

In support of this argument, Appellants point to a number of decisions of this court in which we have applied requirements for environmental impact statements to environmental assessments. *See Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1076 (9th Cir. 2002); *Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1509 (9th Cir. 1997); *S. Or. Citizens Against Toxic Sprays,*

*Inc. v. Clark*, 720 F.2d 1475, 1480 (9th Cir. 1983). Appellants contend that for the same reason that this court has applied certain environmental impact statement requirements to environmental assessments, the requirements of 1508.25 should also apply to application of categorical exclusions.

We have explained, however, that where a proposed action fits within a categorical exclusion, full NEPA analysis is not required. *Wong v. Bush*, 542 F.3d 732, 737 (9th Cir. 2008). Appellants argue that *Wong* does not apply here because it only addresses whether an agency must conduct a NEPA "alternatives" analysis for categorical exclusions and did not concern the "fundamental question" of what requirements apply when determining whether significant impacts exist that would preclude use of a categorical exclusion. We disagree that *Wong* is so limited because its case-specific holding that the alternatives analysis was not necessary when invoking a categorical exclusion is merely application of the general principle that "where agency action falls under a categorical exclusion, it need not comply with the requirements of an [environmental impact statement]." *Id.*; *see also* 40 C.F.R. § 1508.4. Moreover, application of section 1508.25's requirements to categorical exclusions is inconsistent with the efficiencies that the abbreviated categorical exclusion process provides. *See* 40 C.F.R. §§ 1500.4(p), 1500.5(k); *Utah Env't Congress v. Bosworth*, 443 F.3d 732, 741 (10th Cir. 2006). Accordingly, we conclude that section 1508.25's requirements do not apply to BLM's categorical exclusion analysis in this case.

To comply with NEPA, then, BLM had to determine first whether the proposed action—issuance of the gravel permit—fell under a categorical exclusion and then determine whether "extraordinary circumstances" existed that would

prevent use of the categorical exclusion. 40 C.F.R. § 1508.4. Though not required to do so by section 1508.25, under BLM's own regulations, this "extraordinary circumstances" analysis required BLM to consider whether issuance of the gravel permit would "[h]ave a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects." BLM NEPA Handbook Appx. 5, § 2.6; 43 C.F.R. § 46.215(f). We conclude that BLM appropriately found that issuance of the gravel permit fell into a categorical exclusion and adequately explained why the permit had no "cumulatively significant" environmental effects preventing application of the categorical exclusion.

BLM determined that issuance of the gravel permit fell within its categorical exclusion for the "[d]isposal of mineral materials, such as sand, stone, [and] gravel, . . . in amounts not exceeding 50,000 cubic yards or disturbing more than 5 acres, except in riparian areas." BLM then analyzed whether approval of the gravel permit had "a direct relationship to other actions with individually insignificant, but cumulatively significant, environmental effects" and found none.

Appellants contend that BLM's conclusions that there were no cumulative impacts and that the gravel permit is unrelated to Mount Trumbull road work and the Arizona 1 Mine are "wholly undermined by the facts."

However, BLM explained that there were no significant cumulative effects because the gravel lost from extraction under the permit was naturally replenished by rain. Additionally, BLM explained that the gravel extracted would be used for the already-approved maintenance of Mount Trumbull Road and thus, the impact of the road did not increase through issuance of the permit. BLM also reasoned

that because Mohave County had other sources of gravel to maintain Mount Trumbull road, maintenance of the road did not have a direct relationship to issuance of the Robinson Wash gravel permit. Further, BLM explained that it had taken no action to change the scope of the Mount Trumbull Road right-of-way, issued in 1986 to Mohave County.

BLM next explained that the gravel permit does not have a direct relationship to any other activity that may involve Mount Trumbull Road. Those activities, including ranching, hunting, site-seeing, research, mining, accessing Native American lands, and government and administrative uses, had "long been conducted on the Arizona Strip," location of the Arizona 1 Mine, and thus, issuance of the gravel permit was unrelated to those activities' occurrence. As to mining in particular, BLM explained that in approving the 1988 plan of operations, it determined that mining would not have significant environmental effects even when considering the 1986 grant to Mohave County of a right-of-way for the Mount Trumbull Road. As a result, BLM concluded that issuance of the Robinson Wash gravel permit, though related to maintenance of Mount Trumbull Road, would not change the impact of the Arizona 1 Mine.

Appellants object to BLM's reference to the impacts of the 1988 plan of operations and 1986 right-of-way, arguing that if BLM wished to invoke those environmental analyses when reviewing "past" agency action, it had to follow NEPA procedures for "tiering" or "incorporation by reference." "Tiering" is not mandatory; rather, it is merely encouraged by the relevant regulation. 40 C.F.R. § 1502.20. Further, as with section 1508.25, the regulation providing for "incorporation by reference" is applicable to environmental impact statements, not categorical exclusions. *Id.* § 1502.21. Thus,

we conclude BLM's use of the prior analyses in evaluating cumulative impacts of issuance of the gravel permit was appropriate.

Accordingly, we conclude from its comprehensive explanation that BLM considered all appropriate factors, including the cumulative impacts of the gravel permit, Mount Trumbull Road maintenance, and mining at the Arizona 1 Mine, *see id.* § 1508.27(b). Further, we conclude that BLM provided a rational explanation as to why Mount Trumbull Road and the Arizona 1 Mine, though certainly relevant to the issuance of the gravel permit, do not have contingent, "direct relationships" such that issuance of the gravel permit would "have a significant environmental effect" preventing use of the categorical exclusion.

Finally, Appellants argue that BLM violated its own regulations in approving the gravel permit because it provided Denison with a "free gravel source so it could rehabilitate Arizona 1's access roads for a 'commercial purpose.'" *See* 43 C.F.R. 3604.12(a) ("BLM may issue free use permits to a government entity without limitation as to the number of permits or as to the value of the mineral materials to be extracted or removed, provided that the government entity shows that it will not use these materials for commercial or industrial purposes."). BLM issued the permit to Mohave County, not Denison. Mohave County then authorized Denison as its agent to use gravel from the Robinson Wash and maintain Mount Trumbull Road. BLM's regulations permit a local government to "allow [its] agent to extract mineral materials under [its] free use permit." *Id.* § 3604.24(a). Additionally, Mount Trumbull road is a public road. Its maintenance therefore benefits members of the public who wish to access recreational and cultural sites in

the area. Thus, although the maintenance of the road does eventually benefit Denison's commercial enterprise, that does not mean that Mohave County is using the permit for "commercial or industrial purposes," *id.* § 3604.12(a).

In sum, we conclude that BLM's invocation of the categorical exclusion was not arbitrary and capricious or otherwise not in accordance with law. *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999). We thus affirm the district court's summary judgment against Appellants as to BLM's invocation of the categorical exclusion for issuance of the Robinson Wash gravel permit.

**AFFIRMED.**