RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0151p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

SIERRA CLUB,

*Plaintiff-Appellant,*

*v.*

No. 15-2457

UNITED STATES FOREST SERVICE,

*Defendant-Appellee,*

ENBRIDGE ENERGY, LIMITED PARTNERSHIP,

*Intervenor-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 1:15-cv-10154—Thomas L. Ludington, District Judge.

Argued: June 16, 2016

Decided and Filed: June 30, 2016

Before: MOORE, SUTTON, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Marianne G. Dugan, Eugene, Oregon, for Appellant. Lane N. McFadden, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellee. David H. Coburn, STEPTOE & JOHNSON LLP, Washington, D.C., for Appellee Enbridge Energy. **ON BRIEF:** Marianne G. Dugan, Eugene, Oregon, for Appellant. Lane N. McFadden, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellee. David H. Coburn, Joshua Runyan, STEPTOE & JOHNSON LLP, Washington, D.C., for Appellee Enbridge Energy.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.  Plaintiff-Appellant Sierra Club appeals from the district court's decision granting summary judgment in favor of Defendants-Appellees United States Forest Service ("USFS") and Enbridge Energy Limited Partnership ("Enbridge"). Sierra Club argues that the USFS violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(2)(C), in failing to prepare an Environmental Impact Statement ("EIS") or an Environmental Assessment ("EA") prior to reissuing a permit to Enbridge to operate and maintain an oil pipeline on federal land.  In granting summary judgment, the district court concluded that the USFS appropriately found that the reissuance of Enbridge's permit fell within a "categorical exclusion" and thus the agency was not required to prepare an EIS or an EA.  For the reasons discussed below, we **AFFIRM** the judgment of the district court.

**I.  BACKGROUND**

**A.  Factual Background**

The federal government may grant a right-of-way through federal land "for pipeline purposes for the transportation of oil."  30 U.S.C. § 185(a).  Beginning in 1953, the USFS issued a "special use permit" to Lakehead Pipeline Company, Inc. ("Lakehead"), permitting the company to use an 8.10 mile strip of government land within the Lower Michigan National Forest "for the purpose of[] [c]onstructing, operating and maintaining a pipeline to transport crude oil."  R. 20-8 (1954 Permit at 1) (Page ID #1639).  The pipeline ("Line 5") extends from Superior, Wisconsin to Sarnia, Ontario.  *Id.*

In 1992, Lakehead changed its name to Lakehead Pipe Line Company, Limited Partnership, and the USFS reissued the special-use permit to this entity.  R. 17-24 (1992 Permit at 1) (Page ID #1323).  The 1992 permit authorized the use of the right-of-way until December 31, 2012, and noted that the USFS "shall renew the authorization" for a reasonable term "[i]f the right-of-way project or facility is still being used for the purpose(s) previously authorized and is

being operated and maintained in accordance with all the provisions of the authorization" and other applicable laws and resource-management plans. *Id.* at 6 (Page ID #1328).

The 1992 permit was amended in 2002 when Lakehead changed its name to Enbridge Energy, Limited Partnership. R. 17-26 (2002 Amendment at 1) (Page ID #1337). The amendment noted that "only the name of the company has changed not the ownership" and that "[a]ll other conditions of the permit as amended, remain unchanged." *Id.* In 2011 and 2012, after a different Enbridge pipeline ruptured and spilled oil into the Kalamazoo River, Enbridge sought and received amendments to the 1992 permit in order to install "emergency flow release device[s]" on Line 5. R. 18-1 (2011 Amendment) (Page ID #1394); *see* R. 18-3 (2012 Amendment) (Page ID #1407).

In September 2012, Enbridge requested that the USFS renew the special-use permit for Line 5. *See* R. 14-14 (Decision Memo at 1) (Page ID #336); R. 14-16 (9/26/12 Email at 1) (Page ID #400). The USFS reviewed Enbridge's request in 2013 and conducted field studies on the potential impact on certain wildlife and vegetation in the area. *See* R. 17-12 (4/2/13 Letter at 1–2) (Page ID #1219–20); R. 14-14 (Decision Memo at App'x C) (Page ID #354); *id.* at App'x D (Page ID #377). In 2014, the USFS contacted the United States Department of Transportation's ("DOT") Pipeline and Hazardous Materials Safety Administration ("PHMSA") in order to confirm that Enbridge and Line 5 were in compliance with state and federal pipeline regulations. *See* R. 15-32 (2/28/14 Email at 1) (Page ID #1007).

On January 29, 2014, the USFS began a public comment period for the proposed renewal of Enbridge's special-use permit. *See* R. 14-2 (Public Notice at 1–3) (Page ID #228–30). The USFS proposed that a categorical exclusion to the documentation required by an EIS or EA applied. *Id.* at 2 (Page ID #229). Specifically, the USFS proposed that the renewal fell into category 15 ("CE-15"), which applies to the

> [i]ssuance of a new special use authorization for a new term to replace an existing or expired special use authorization when the only changes are administrative, there are not changes to the authorized facilities or increases in the scope or intensity of authorized activities, and the applicant or holder is in full compliance with the terms and conditions of the special use authorization.

*Id.* at 2 (Page ID #229) (quoting 36 C.F.R. § 220.6(e)(15)).

The USFS received comments from the public in response, including a letter from Marvin Roberson, a Sierra Club Forest Ecologist, sent on behalf of Sierra Club. *See* R. 14-9 (Roberson Letter at 1–3) (Page ID #318–20). Sierra Club's letter objected to the application of CE-15 for three reasons. *Id.* at 1 (Page ID #318). First, Sierra Club stated that no EA or EIS had ever been completed for Line 5 because the original permit was issued "prior to the enactment of NEPA." *Id.* at 2 (Page ID #319). Second, Sierra Club argued that intensity of activities along the pipeline had increased over the past two years because oil flow within the pipeline had "increased by over 10%," and thus the exclusion did not apply. *Id.* Finally, Sierra Club contended that Enbridge's prior permit expired on December 31, 2012; because Enbridge was therefore not "renew[ing]" its prior permit request, Sierra Club asserted that the USFS must treat the application as a new permit request and prepare an EA or EIS. *Id.*

The USFS responded on March 31, 2014. *See* R. 15-40 (3/31/14 Letter) (Page ID #1023). The USFS explained that Enbridge's renewal "made no request to change the pipeline operations" as authorized by the existing permit, and that the existing "permit is for the operation and maintenance of the pipeline," not for any particular oil flow through the pipeline, which "is regulated by the [PHMSA] of the [DOT] and outside the scope of this project." *Id.* at 1–2 (Page ID #1023–24). The USFS also noted that the language of CE-15 explicitly referred to expired permits. *Id.* at 3 (Page ID #1025).

On December 10, 2014, the USFS issued a "Decision Memo," concluding that Enbridge should be reissued a permit to continue its existing operations and "that this decision qualifies for categorical exclusion from documentation in an [EIS] or [EA]" under CE-15. R. 14-14 (Decision Memo at 13) (Page ID #348). In reaching this conclusion, the memo evaluated whether any "extraordinary circumstances" applied such that an EA or EIS was necessary regardless of the otherwise applicable exclusion. *Id.* at 5 (Page ID #340). Accordingly, the memo discussed the impact that the reissuance would have on certain flora and fauna in the area, and specifically, whether the reissuance would affect the Kirtland's warbler, an endangered songbird. *Id.* at 5–6 (Page ID #340–41). The USFS concluded that the reissuance "[w]ould have no effect on the Kirtland's warbler." *Id.* at 6 (Page ID #341). The USFS attached the biological assessment reports prepared by a biologist and a botanist. *See id.* at App'x C (Page ID #354–

68); *id.* at App'x D (Page ID #377–80).    The memo concluded that "no extraordinary circumstances which may result in significant individual or cumulative effects on the quality of the environment" existed. *Id.* at 13 (Page ID #348).

The USFS subsequently re-issued Enbridge's special-use permit.  R. 51-2 (2015 Permit) (Page ID #2385).

**B.  Procedural History**

The Sierra Club filed suit against the USFS in the United States District Court for the Eastern District of Michigan on January 14, 2015, alleging that the USFS violated NEPA by not preparing an EA or EIS.  R. 1 (Compl. at 1, 7–13) (Page ID #1, 7–13).  Enbridge intervened as a defendant on February 25, 2015.  R. 7 (Order Granting Mot. to Intervene) (Page ID #116).  The parties filed cross-motions for summary judgment, *see* R. 27 (Pl. Mot. for Summ. J.) (Page ID #1970); R. 37 (USFS Cross-Mot. for Summ. J.) (Page ID #2092); R. 40 (Enbridge Cross-Mot. for Summ. J.) (Page ID #2214), and each party also filed a response.  *See* R. 36 (USFS Resp. to Pl. Mot. for Summ. J.) (Page ID #2051); R. 39 (Enbridge Resp. to Pl. Mot. for Summ. J.) (Page ID #2137); R. 44 (Pl. Resp. to Cross-Mot. for Summ. J.) (Page ID #2301).

The district court granted the defendants' cross-motions for summary judgment on September 30, 2015, concluding that the USFS properly applied CE-15 in reissuing Enbridge's permit without conducting an EIS or EA.  *See* R. 52 (09/30/15 D. Ct. Order at 12–21) (Page ID #2673–82).  Judgment was entered in favor of the USFS and Enbridge, R. 53 (Judgment) (Page ID #2684), and Sierra Club timely appealed.  R. 54 (Notice of Appeal) (Page ID #2685).

**II.  DISCUSSION**

**A.  Standard of Review**

The Administrative Procedure Act ("APA") provides for judicial review of final agency actions.  5 U.S.C. § 702.  "When a district court upholds on summary judgment an administrative agency's final decision under the APA," this Circuit reviews the district court's decision de novo but reviews the agency's action under the APA's arbitrary or capricious standard.  *Ky. Waterways All. v. Johnson*, 540 F.3d 466, 473 (6th Cir. 2008).  "The APA directs courts to 'hold

unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 407 (6th Cir. 2013) (quoting 5 U.S.C. § 706(2)(A)). A decision is arbitrary or capricious under the APA if the agency

> has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## B. Statutory and Regulatory Framework

Congress enacted NEPA "to reduce or eliminate environmental damage." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004). "NEPA itself does not mandate particular results in order to accomplish these ends," but rather "imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Id.* at 756–57 (internal quotation marks omitted). NEPA's "'action-forcing' procedures . . . require that agencies take a 'hard look' at environmental consequences." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (internal quotations omitted).

In forcing agencies to "take a 'hard look' at environmental consequences," *id.* (internal quotations omitted), NEPA requires federal agencies to prepare an EIS when the agency proposes "'major Federal actions significantly affecting the quality of the human environment.'" *Pub. Citizen*, 541 U.S. at 757 (quoting 42 U.S.C. § 4332(2)(C)). An EIS must detail, among other things, "the environmental impact of the proposed action," "any adverse environmental effects which cannot be avoided" in implementing the proposal, and any available alternatives. 42 U.S.C. § 4332(2)(C). Under regulations promulgated by the Council of Environmental Quality ("CEQ") an agency may "prepare a more limited document, an Environmental Assessment (EA)," in some circumstances. *Pub. Citizen*, 541 U.S. at 757. An EA "is a highly significant 'first step' that determines whether the next step will or will not be the preparation of

a fully polished, high-budget environmental impact statement." *Friends of Fiery Gizzard v. Farmers Home Admin.*, 61 F.3d 501, 504 (6th Cir. 1995). If the EA demonstrates "that the project will have no significant adverse environmental consequences," then the agency is not required to prepare an EIS but "must publish a finding of no significant impact." *Id.* at 504–05 (internal quotation marks omitted); *see also* 40 C.F.R. §§ 1501.4(e), 1508.13.

"In some cases, however, neither an EA nor an EIS is required." *West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 927 (9th Cir. 2000). CEQ regulations allow an agency to adopt a "categorical exclusion" for a "category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations.'" *Id.* (quoting 40 C.F.R. § 1508.4). The procedures adopted by an agency to establish a categorical exclusion, however, must "provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect" and thus require further action. 40 C.F.R. § 1508.4; *see also Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096 (9th Cir. 2013); *California v. Norton*, 311 F.3d 1162, 1168 (9th Cir. 2002).

"Pursuant to CEQ regulations, each agency develops criteria to determine the appropriate level of environmental review for different types of actions," *West*, 206 F.3d at 927 (citing 40 C.F.R. § 1507.3(b)(2)), and the USFS has accordingly established several CEs. *See* 36 C.F.R. § 220.6(a), (d)–(e). The USFS has promulgated nineteen categories of agency action, such as CE-15, for which the agency must prepare "a project or case file and decision memo," but not an EA or EIS. 36 C.F.R. § 220.6(e). A decision memo must include the agency's reason for invoking the CE as well as "[a] finding that no extraordinary circumstances exist." 36 C.F.R. § 220.6(f)(2)(iii). "To determine whether extraordinary circumstances exist," USFS regulations direct the agency to "consider if the proposed action may have a potentially significant impact on certain 'resource conditions.'" *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 741 (10th Cir. 2006); *see* 36 C.F.R. § 220.6(b). These "resource conditions" include the presence of "[f]ederally listed threatened or endangered species or designated critical habitat." 36 C.F.R. § 220.6(b)(1)(i). USFS regulations specify, however, that "[t]he mere presence of one or more of these resource conditions does not preclude use of a categorical exclusion," but rather the

agency must consider whether "a cause-effect relationship between a proposed action" and these resource conditions exists and, if so, "the degree of the potential effect." 36 C.F.R. § 220.6(b)(2).

Agencies engage in a "scoping" process to identify significant issues. 40 C.F.R. § 1501.7. USFS regulations on CEs require that the agency prepare an EA if an "official determines, based on scoping, that it is uncertain whether the proposed action may have a significant effect on the environment," and the agency must prepare an EIS if "the proposed action may have a significant environmental effect." 36 C.F.R. § 220.6(c).

## C. The USFS Did Not Arbitrarily Apply CE-15 in Reissuing Enbridge's Permit

Sierra Club argues that the USFS acted arbitrarily in applying CE-15 and not conducting an EA or EIS. Sierra Club's objections can be grouped into two sets of arguments: first, those that contend that the reissuance of Enbridge's permit falls outside of the plain language of CE-15, and second, those that assert that "extraordinary circumstances" apply such that an EA and EIS were required even if the action might normally be excluded from documentation.

### 1.    The Renewal of Enbridge's Permit Falls Within the Text of CE-15

Sierra Club contends that the plain language of CE-15 does not apply to the reissuance of Enbridge's permit because (1) Enbridge has increased the oil flow on Line 5 and (2) Enbridge's 1992 permit expired prior to the issuance of the 2015 permit. Neither of these arguments are persuasive.

Sierra Club first asserts that Enbridge has dramatically increased "the scope and intensity of use of the pipeline within the past two years." *See* Appellant Br. at 14. CE-15 applies to the reissuance of a permit "when the only changes are administrative" and "there are not changes to the authorized facilities or increases in the scope or intensity of authorized activities." 36 C.F.R. § 220.6(e)(15). Accordingly, Sierra Club argues, the USFS cannot invoke CE-15 here. Contrary to Sierra Club's assertions, however, there have been no "increases in the scope or intensity" of activities authorized by Enbridge's 1992 permit. *Id.* The 2015 permit grants Enbridge an 8.10 mile right-of-way through the Huron-Manistee National Forest to "operat[e] and maintain[] a . . .

steel pipeline . . . and associated facilities." R. 51-2 (2015 Permit) (Page ID #2385).[1] This is the same use authorized by the original permit, which granted Lakehead Pipeline an 8.10 mile right-of-way "for the purpose of[] [c]onstructing, operating and maintaining a pipeline to transport crude oil across Government owned land within the Lower Michigan National Forest." R. 20-8 (1953 Permit at 1) (Page ID #1639). Although Sierra Club contends that Enbridge has increased the volume of oil flow within the pipes, "[t]he Forest Service does not and never has regulated the flow of oil inside the pipeline." USFS Appellee Br. at 22. The PHMSA has authority to regulate oil pipeline flow and pressure. *See, e.g.*, 49 C.F.R. § 195.106. Accordingly, Enbridge has not varied the "scope or intensity of authorized activities," 36 C.F.R. § 220.6(e)(15), between the earlier permit and the 2015 permit because the permit only authorizes use of a right-of-way and the scope of the right-of-way has not changed.

Next, Sierra Club contends that the 2015 permit is not an administrative continuation of the 1992 permit because "[t]he previous permit expired December 31, 2012" and the new permit "was issued to a new company, not to the original permittee." Appellant Br. at 17. This is not persuasive. First, the plain language of CE-15 refers to the "[i]ssuance of a new special use authorization . . . to replace an existing *or expired* special use authorization." 36 C.F.R. § 220.6(e)(15) (emphasis added); *see* USFS Appellee Br. at 33. Accordingly, it is irrelevant that the 1992 permit may have "expired" two years earlier, because CE-15 applies to expired permits. Second, as the USFS points out, "[t]he APA provides that '[w]hen the licensee has made timely and sufficient application for a renewal or a new license in accordance with agency rules, a license with reference to an activity of a continuing nature does not expire until the application has been finally determined by the agency.'" USFS Appellee Br. at 34 (quoting 5 U.S.C. § 558(b)). The record shows that Enbridge applied for a renewal prior to the expiration of the 1992 permit and Enbridge continued to pay fees for the right-of-way during the time that the USFS was considering their application. *See, e.g.*, R. 14-16 (9/26/12 Email) (Page ID #400); R.

---

[1] Sierra Club asserts that the new permit provides a larger, 61.09 acre or 8.4 mile, right-of-way. Appellant Br. at 15. In support of this statement, Sierra Club cites a final draft of the special-use permit in the record that provides the "permit covers 61.09 acres . . . or 8.4 miles," R. 14-18 (Final Permit Draft at 1) (Page ID #409), but the other documents attached to this draft state that the permit covers only 58.98 acres or 8.1 miles. *Id.* at 12 (Page ID #420). The USFS later issued the permit to Enbridge, *see* R. 51 (Notice at 1–2) (Page ID #2381–82), and this final permit document states that the right-of-way is 58.98 acres or 8.1 miles. *See* R. 51-2 (2015 Permit at 1) (Page ID #2385). According to the USFS, the discrepancy was a typographical error. USFS Appellee Br. at 25.

19-55 (02/01/2013 Bill) (Page ID #1576). Enbridge's 1992 permit was thus not "expired" under the APA. Lastly, Sierra Club is also incorrect in asserting that the new permit "was issued to a new company." Appellant Br. at 17. The 1992 permit was issued to Lakehead, but the USFS amended the 1992 permit in 2002 when Lakehead changed its name to Enbridge. *See* R. 17-26 (2002 Amendment) (Page ID #1337). The 2002 amendment states that "only the name of the company has changed not the ownership" and "[a]ll other conditions of the permit as amended, remain unchanged." *Id.*; *see also* USFS Appellee Br. at 36. Accordingly, Sierra Club's arguments that the 2015 permit "is a brand-new permit to a new permittee" are without merit. Appellant Br. at 17.

##### 2. The USFS Did Not Act Arbitrarily in Determining That No "Extraordinary Circumstances" Existed

Sierra Club also advances several arguments that relate to whether the USFS appropriately determined that no "extraordinary circumstances" exist precluding the use of CE-15. These arguments are similarly unavailing.

Sierra Club first argues that the USFS cannot utilize CE-15 because "[t]he project may impact an endangered species, Kirtland's warbler." Appellant Br. at 16. As discussed above, even if a proposed agency action would normally fall within a CE, the USFS is required to consider whether "extraordinary circumstances related to the proposed action" preclude the use of the CE. *See* 36 C.F.R. § 220.6(a). To make this determination, USFS regulations require the agency to consider certain "[r]esource conditions," including whether there are "[f]ederally listed threatened or endangered species" in the area. 36 C.F.R. § 220.6(b)(1)(i). Although it is undisputed that Kirtland's warbler, an endangered songbird, is "known to occur" in the area of national forest where Line 5 is located, s*ee* R. 14-14 (Decision Memo at App'x C, p.5) (Page ID #358), this does not preclude the USFS from applying CE-15. Under USFS regulations, the "mere presence" of an endangered species does not preclude the use of a CE. 36 C.F.R. § 220.6(b)(2). Rather, the USFS must consider whether there is "a cause-effect relationship between a proposed action" and the species, and if so, "the degree of the potential effect" of the agency action on the species. *Id.* Here, the USFS's decision memo on the 2015 permit includes a biologist's report that unambiguously concludes that "the Enbridge Special Use Authorization

would have no effect on Kirtland's warbler." R. 14-14 (Decision Memo at App'x D, p.9) (Page ID #362). The reasons behind this conclusion are documented in the biologist's report and summarized in the agency's decision memo. Sierra Club has not raised any arguments that undermine the biologist's report, and it has not demonstrated that the agency acted arbitrarily in relying on the biologist's conclusion in determining that no "extraordinary circumstances" existed such that CE-15 could not apply. Accordingly, Sierra Club is not entitled to relief on the basis of this argument.

Sierra Club advances two final arguments. In its opening brief, Sierra Club cites 40 C.F.R. § 1508.25(a) for the proposition that the USFS was required to assess the "cumulative impacts" of its actions prior to applying the CE. Appellant Br. at 18. Section 1508.25, however, relates to the types of actions that an agency must consider "[t]o determine the scope of environmental impact statements." 40 C.F.R. § 1508.25(a). As discussed above, a categorical exclusion is defined as "a category of actions which do not individually *or cumulatively* have a significant effect on the human environment," and thus no EIS is required. 40 C.F.R. § 1508.4 (emphasis added). Because a categorical exclusion *defines* a type of agency action that has no cumulative significant effect on the environment, courts have "conclude[d] that section 1508.25's requirements do not apply to [an agency's] categorical exclusion analysis." *See, e.g.*, *Ctr. for Biological Diversity*, 706 F.3d at 1097; *Utah Envtl. Cong.*, 443 F.3d at 741. Rather, in order to comply with NEPA, the agency must determine whether a CE applies and whether an "extraordinary circumstance" exists that precludes the use of a CE; the agency is not required to independently evaluate cumulative impacts because this process already takes cumulative impacts into account. *See Ctr. for Biological Diversity*, 706 F.3d at 1097; *Utah Envtl. Cong.*, 443 F.3d at 741–42.

Relatedly, Sierra Club argues that the agency must independently consider the factors set forth in 40 C.F.R. § 1508.27(b) in determining whether an EIS is required. *See* Appellant Br. at 22–25. Section 1508.27 defines "significantly" for the purposes of NEPA. The regulation states that "[s]ignificantly as used in NEPA requires considerations of both context and intensity" and the regulation directs agencies to consider several factors in evaluating the "intensity" of an action, including "[t]he degree to which the proposed action affects public health or safety" and

"[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(a)–(b). Sierra Club asserts that the USFS failed to discuss these factors in applying CE-15, but, as with the "cumulative impact" analysis discussed above, the USFS was not required independently to evaluate these factors. As stated above, a CE is defined as a category of agency action that has no "significant effect on the human environment." 40 C.F.R. § 1508.4. And, in order for the agency to establish CEs, agencies must "provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect." *Id*. The USFS has promulgated CE regulations that require the USFS to consider certain "[r]esource conditions" in determining whether an extraordinary circumstance exists. 36 C.F.R. § 220.6(b). Accordingly, USFS regulations—which set forth the agency's CEs and how the agency must determine whether an extraordinary circumstance exists—necessarily take into account the NEPA-wide definition of "[s]ignificantly" provided in § 1508.27. Because Sierra Club does not challenge the substance of USFS's regulations here, the question is whether the record demonstrates that the USFS appropriately evaluated the present facts against its regulations and whether the USFS reached a non-arbitrary conclusion. *See, e.g.*, *Ctr. for Biological Diversity*, 706 F.3d at 1097–98; *U.S. v. Coal. for Buzzards Bay*, 644 F.3d 26, 34–35 (1st Cir. 2011); *Utah Envtl. Cong.*, 443 F.3d at 741–42.

The USFS did so here. The USFS publicly promulgated its intent to apply CE-15, accepted public comments, and responded to the comments that it received. *See* R. 14-2 (Public Notice at 1–3) (Page ID #228–30); R. 15-40 (3/31/14 Letter) (Page ID #1023). The USFS determined that Enbridge was in compliance with pipeline regulations, *see* R. 15-32 (2/28/14 Email at 1) (Page ID #1007), and evaluated whether any "resource conditions" existed such that an extraordinary circumstance may apply. *See, e.g.*, R. 14-14 (Decision Memo at 5–6) (Page ID #340–341). It set forth this discussion in its Decision Memo and attached evaluations from both a biologist and a botanist that concluded that reissuing the permit would not have an impact on sensitive flora or fauna populations in the area, including Kirtland's warbler. *Id.* at 13; App'x C; App'x D (Page ID #348, 354–80). This is not a case in which the agency "failed entirely to consider the potential environmental consequences of its decision at the time the decision was made" and instead used a CE as a "post-hoc rationalization" for the agency's actions. *See, e.g.*, *Norton*, 311 F.3d at 1175–76; *Jones v. Gordon*, 792 F.2d 821, 828–29 (9th Cir. 1986). Rather,

the record demonstrates that the USFS followed the appropriate decision-making process and reached a non-arbitrary conclusion.

### III. CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the district court.