**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BARK; CASCADIA WILDLANDS;
OREGON WILD,
    *Plaintiffs-Appellants*,

    v.

UNITED STATES FOREST SERVICE, a
federal agency,
    *Defendant-Appellee*,

HIGH CASCADE, INC.,
  *Intervenor-Defendant-Appellee.*

No. 19-35665

D.C. No.
3:18-cv-01645-
MO

ORDER AND
OPINION

Appeal from the United States District Court
for the District of Oregon
Michael W. Mosman, District Judge, Presiding

Argued and Submitted December 10, 2019
Seattle, Washington

Filed May 4, 2020

Before: Susan P. Graber, Marsha S. Berzon,
and Stephen A. Higginson,[*] Circuit Judges.

---

[*] Stephen A. Higginson, United States Circuit Judge for the U.S. Court of Appeals for the Fifth Circuit, sitting by designation.

Order;
Opinion by Judge Higginson;
Concurrence by Judge Graber

**SUMMARY**[**]

**Environmental Law**

The panel granted appellants' request to publish the unpublished Memorandum Disposition with modifications; and reversed the district court's summary judgment in favor of the U.S. Forest Service in an action alleging violations of the National Environmental Policy Act and National Forest Management Act.

The Crystal Clear Restoration ("CCR") Project is a forest management effort and timber sale affecting 11,742 acres in Mt. Hood National Forest.

The panel held that the Forest Service's determination that the CCR Project did not require an Environmental Impact Statement ("EIS") was arbitrary and capricious for two independent reasons. First, the effects of the Project were highly controversial and uncertain, thus mandating the creation of an EIS. *See* 40 C.F.R. § 1508.27(b)(4) & (5). Second, the Forest Service failed to identify and meaningfully analyze the cumulative impacts of the Project.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Because an EIS was required, and because the findings in the EIS could prompt the Forest Service to change the scope of the Project or the methods it planned to use, the panel did not reach the appellants' other claims. The panel remanded to the Forest Service for further proceedings.

Judge Graber concurred in full in the judgment and in all but section III-B of the majority opinion. She agrees that an EIS was required, but would not reach whether the environmental assessments' discussion of cumulative impacts also was arbitrary and capricious.

## COUNSEL

Brenna Bell (argued), Portland, Oregon; Nick Cady, Eugene, Oregon; for Plaintiffs-Appellants.

Jeffrey S. Beelaert (argued), Shaun M. Pettigrew, and Krystal-Rose Perez, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jeffrey Bossert Clark, Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Stephen A. Vaden, General Counsel; Val J. McLam Black, Senior Counsel, United States Department of Agriculture, Washington, D.C.; for Defendant-Appellee.

Lawson E. Fite (argued), and Sara Ghafouri, American Forest Resource Council, Portland, Oregon, for Intervenor-Defendant-Appellee.

## ORDER

Appellants' request to publish the unpublished Memorandum disposition, Docket No. 37, is **GRANTED**. The Memorandum disposition filed April 3, 2020, is redesignated as an authored Opinion by Judge Higginson, with modifications. The time for filing a petition for rehearing and petition for rehearing en banc shall start anew as of the filed date of this Opinion.

## OPINION

HIGGINSON, Circuit Judge:

Appellants Bark, Cascadia Wildlands, and Oregon Wild timely appeal the district court's summary judgment in favor of Appellees, the United States Forest Service (USFS) and High Cascade, for claimed violations of the National Environmental Policy Act (NEPA) and the National Forest Management Act (NFMA). We hold that the USFS's determination that the Crystal Clear Restoration (CCR) Project did not require an Environmental Impact Statement (EIS) was arbitrary and capricious and so reverse. We do not reach the NFMA claims.

## I.

The CCR Project is a forest management effort and timber sale affecting 11,742 acres in Mt. Hood National Forest. The Project area is partly a moist "transition" climate, and partly a dry "eastside" climate. According to the USFS, forest stands in the area tend to be overstocked as a result of past management practices. When trees are closer together, they are more susceptible to insects and disease and

to high-intensity wildfires. The USFS undertook the CCR Project in order to "provide forest products from specific locations within the planning area where there is a need to improve stand conditions, reduce the risk of high-intensity wildfires, and promote safe fire suppression activities." The USFS plans to achieve these goals in part using a technique called "variable density thinning." This process gives the agency flexibility in choosing which trees to cut, thereby allowing the USFS to create variation within an area of forest so that the stands "mimic more natural structural stand diversity." The USFS plans to leave an average canopy cover of 35–60%, with a minimum of 30% where the forest is more than 20 years old.

"NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at environmental consequences" of their proposed actions. *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 763 (9th Cir. 2014) (internal quotation marks omitted). Agencies must prepare an EIS for federal actions that will "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C). To determine whether a proposed action will have a significant effect on the quality of the human environment, agencies must prepare an Environmental Assessment (EA) that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1). An EIS is required when this process raises "substantial questions" about whether an agency action will have a significant effect. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998); *see also Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238–39 (9th Cir. 2005). "If the agency concludes in the EA that there is no significant effect from

the proposed project, the federal agency may issue a finding of no significant impact ('FONSI') in lieu of preparing an EIS." *Native Ecosystems Council*, 428 F.3d at 1239 (citing 40 C.F.R. § 1508.9(a)(1); *id.* § 1508.13).

After conducting an EA, the USFS determined that the CCR Project had no significant effects. It therefore issued a FONSI and did not prepare an EIS.

Appellants filed a complaint against the USFS bringing claims under NEPA and the NFMA. The NEPA claim alleged that the USFS did not undertake a proper analysis of the environmental impacts of the Project or of alternatives to the Project. The NFMA claim alleged that the USFS failed to comply with two forest plans and other guidance documents governing the Project area as required by the NFMA. The district court granted summary judgment to Appellees on all claims. Appellants timely appealed.

## II.

We review the district court's grant of summary judgment de novo. *Ctr. for Biological Diversity v. Ilano*, 928 F.3d 774, 779 (9th Cir. 2019). The Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), provides the governing standard for courts reviewing an agency's compliance with NEPA and the NFMA. *Native Ecosystems Council*, 428 F.3d at 1238. Under the APA, we may overturn an agency's conclusions when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "An agency action is arbitrary and capricious if the agency has: relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be

ascribed to a difference in view or the product of agency expertise." *WildEarth Guardians v. U.S. E.P.A.*, 759 F.3d 1064, 1069–70 (9th Cir. 2014) (quoting *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1109 (9th Cir. 2012)). An agency's factual determinations "must be supported by substantial evidence." *Connaughton*, 752 F.3d at 759.

In reviewing an agency's finding that a project has no significant effects, courts must determine whether the agency has met NEPA's hard look requirement, "based [its decision] on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant." *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014) (alteration in original) (quoting *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv. (EPIC)*, 451 F.3d 1005, 1009 (9th Cir. 2006)). The term "significant" includes considerations of both the context and the intensity of the possible effects. 40 C.F.R. § 1508.27. "Context simply delimits the scope of the agency's action, including the interests affected." *In Def. of Animals*, 751 F.3d at 1068 (quoting *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001), *abrogated in part on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010)). Consideration of context involves analysis "in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a). "[I]n the case of a site-specific action, significance . . . usually depend[s] upon the effects in the locale rather than in the world as a whole." *Id.*

Consideration of intensity "refers to the severity of impact." *Id.* § 1508.27(b). NEPA regulations list ten non-exhaustive factors that inform an agency's intensity

determination, including "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," *id.* § 1508.27(b)(4), "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," *id.* § 1508.27(b)(5), and "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts," *id.* § 1508.27(b)(7). The regulations explain that "[s]ignificance exists if it is reasonable to anticipate a cumulatively significant impact on the environment," and "cannot be avoided by . . . breaking [an action] down into small component parts." *Id.* "When substantial questions are raised as to whether a proposed project 'may cause significant degradation of some human environmental factor,' an EIS is required." *In Def. of Animals*, 751 F.3d at 1068.

## III.

The USFS's decision not to prepare an EIS was arbitrary and capricious for two independent reasons.

## A.

First, the effects of the Project are highly controversial and uncertain, thus mandating the creation of an EIS. *See* 40 C.F.R. § 1508.27(b)(4) & (5) (listing relevant factors for whether an EIS is required, including if the project's effects are "highly controversial" and "highly uncertain"). The stated primary purpose of the CCR Project is to reduce the risk of wildfires and promote safe fire-suppression activities, but Appellants identify considerable scientific evidence showing that variable density thinning will not achieve this purpose. Considering both context and intensity, as required by 40 C.F.R. § 1508.27, this evidence raises substantial questions about the Project's environmental impact, and an

EIS is required. *See, e.g.*, *Blackwood*, 161 F.3d at 1212; *Native Ecosystems Council*, 428 F.3d at 1238–39.

"A project is 'highly controversial' if there is a 'substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a use.'" *Native Ecosystems Council*, 428 F.3d at 1240 (alteration in original) (quoting *Blackwood*, 161 F.3d at 1212). "A substantial dispute exists when evidence . . . casts serious doubt upon the reasonableness of an agency's conclusions." *In Def. of Animals*, 751 F.3d at 1069 (quoting *Babbitt*, 241 F.3d at 736). "[M]ere opposition alone is insufficient to support a finding of controversy." *WildEarth Guardians v. Provencio*, 923 F.3d 655, 673 (9th Cir. 2019).

The EA explained that the CCR Project will use "variable density thinning" to address wildfire concerns. "In variable density thinning, selected trees of all sizes . . . would be removed." This process would assertedly make the treated areas "more resilient to perturbations such as . . . large-scale high-intensity fire occurrence because of the reductions in total stand density." Variable density thinning will occur in the entire Project area.

Substantial expert opinion presented by the Appellants during the administrative process disputes the USFS's conclusion that thinning is helpful for fire suppression and safety. For example, Oregon Wild pointed out in its EA comments that "[f]uel treatments have a modest effect on fire behavior, and could even make fire worse instead of better." It averred that removing mature trees is especially likely to have a net negative effect on fire suppression. Importantly, the organization pointed to expert studies and research reviews that support this assertion.

Bark also raised this issue: "It is becoming more and more commonly accepted that reducing fuels does not consistently prevent large forest fires, and seldom significantly reduces the outcome of these large fires," citing an article from *Forest Ecology and Management*. Bark also directed the USFS to a recent study published in *The Open Forest Science Journal*, which concluded that fuel treatments are unlikely to reduce fire severity and consequent impacts, because often the treated area is not affected by fire before the fuels return to normal levels. Bark further noted that, while "Bark discussed [during the scoping process] the studies that have found that fuel reduction may actually exacerbate fire severity in some cases as such projects leave behind combustible slash, open the forest canopy to create more ground-level biomass, and increase solar radiation which dries out the understory[,] [t]he EA did not discuss this information."

Oregon Wild also pointed out in its EA comments that fuel reduction does not necessarily suppress fire. Indeed, it asserted that "[s]ome fuel can actually help reduce fire, such as deciduous hardwoods that act as heat sinks (under some conditions), and dense canopy fuels that keep the forest cool and moist and help suppress the growth of surface and ladder fuels . . . ." Oregon Wild cited more than ten expert sources supporting this view. Importantly, even the Fuels Specialist Report produced by the USFS itself noted that "reducing canopy cover can also have the effect of increasing [a fire's rate of spread] by allowing solar radiation to dry surface fuels, allowing finer fuels to grow on . . . the forest floor, and reducing the impact of sheltering from wind the canopy provides."

The effects analysis in the EA did not engage with the considerable contrary scientific and expert opinion; it

instead drew general conclusions such as that "[t]here are no negative effects to fuels from the Proposed Action treatments." Appellants thus have shown a substantial dispute about the effect of variable density thinning on fire suppression. Although it is not our role to assess the merits of whether variable density thinning is indeed effective in the project area to prevent fires, or to take sides in a battle of the experts, *see Greenpeace Action v. Franklin*, 14 F.3d 1324, 1333 (9th Cir. 1992), NEPA requires agencies to consider all important aspects of a problem. *See WildEarth Guardians*, 759 F.3d at 1069–70. Throughout the USFS's investigative process, Appellants pointed to numerous expert sources concluding that thinning activities do not improve fire outcomes. In its responses to these comments and in its finding of no significant impact, the USFS reiterated its conclusions about vegetation management but did not engage with the substantial body of research cited by Appellants. This dispute is of substantial consequence because variable density thinning is planned in the entire Project area, and fire management is a crucial issue that has wide-ranging ecological impacts and affects human life. When one factor alone raises "substantial questions" about whether an agency action will have a significant environmental effect, an EIS is warranted. *See Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005) ("We have held that one of [the NEPA intensity] factors may be sufficient to require preparation of an EIS in appropriate circumstances."). Thus, the USFS's decision not to prepare an EIS was arbitrary and capricious. *See Blackwood*, 161 F.3d at 1213 (holding that conflicting evidence on the effects of ecological intervention in post-fire landscapes made a proposed project highly uncertain, thus requiring an EIS).

**B.**

The USFS also failed to identify and meaningfully analyze the cumulative impacts of the Project. "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . undertakes such other actions." 40 C.F.R. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* "[I]n considering cumulative impact, an agency must provide 'some quantified or detailed information; . . . [g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided.'" *Ocean Advocates*, 402 F.3d at 868 (alterations in original) (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379–80 (9th Cir. 1998)). "This cumulative analysis 'must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects.'" *Id.* (quoting *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002)) (internal quotation marks omitted). We have held that cumulative impact analyses were insufficient when they "discusse[d] only the direct effects of the project at issue on [a small area]" and merely "contemplated" other projects but had "no quantified assessment" of their combined impacts. *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 994 (9th Cir. 2004).

The EA ostensibly analyzed the cumulative effects of the CCR Project, and included a table of other projects that were "considered in the cumulative effects analyses." The cumulative impact analysis is insufficient because there is no

meaningful analysis of any of the identified projects. The table gave no information about any of the projects listed; it merely named them. The section of the EA actually analyzing the cumulative effects on vegetation resources did not refer to any of these other projects. Nor are there any specific factual findings that would allow for informed decision-making. The EA simply concluded that "there are no direct or indirect effects that would cumulate from other projects due to the minimal amount of connectivity with past treatments" and that the Project "would have a beneficial effect on the stands by moving them toward a more resilient condition that would allow fire to play a vital role in maintaining stand health, composition and structure." These are the kind of conclusory statements, based on "vague and uncertain analysis," that are insufficient to satisfy NEPA's requirements. *Ocean Advocates*, 402 F.3d at 869.

The EA also mentioned the possibility of cumulative effects in sections on other specific sub-topics such as fuels management, transportation resources, and soil productivity. These sections similarly relied on conclusory assertions that the Project has "no cumulative effects." When the EA did acknowledge the possibility of the Project's impact, such as in the section that analyzed the Project's effects on spotted owls, it noted only that "[t]imber harvest on federal, tribal, and private land, and utility corridor operations have reduced the amount of suitable habitat . . . on the landscape and could continue to do so in the future," without attempting to quantify the cumulative loss or naming other projects. Yet there were other relevant timber projects to discuss. Appellants pointed out at least three other recent or future timber projects in their comments responding to the EA, but the relevant section of the document limited its analysis to only the Project area and a 1.2-mile buffer surrounding it. Such a small buffer zone fails to distinguish the EA's

cumulative impact analysis from an analysis of the direct effects of the Project. *See Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d. at 997 (assessing cumulative effects at the critical habitat unit scale). The USFS's failure to engage with the other projects identified by Appellants leaves open the possibility that several small forest management actions will together result in a loss of suitable owl habitat. Preventing or adequately mitigating this potential loss is the fundamental purpose of NEPA's requirement that agencies analyze cumulative impacts, and we have no basis in the record to assess whether the USFS has taken the necessary steps to consider this possibility.

Overall, there is nothing in the EA that could constitute "quantified or detailed information" about the cumulative effects of the Project. *Ocean Advocates*, 402 F.3d at 868 (internal quotation marks omitted). The USFS's analysis creates substantial questions about whether the action will have a cumulatively significant environmental impact. Therefore, this factor also requires the USFS to conduct an EIS. *See* 40 C.F.R. § 1508.27(b)(7).

## IV.

Because an EIS is required, and because the findings in the EIS could prompt the USFS to change the scope of the Project or the methods it plans to use, we do not reach the Appellants' other claims. We reverse the district court's judgment and remand to the district court with instructions to remand to the USFS for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**

GRABER, Circuit Judge, concurring:

I concur in full in the judgment and in all but section III-B of the majority opinion. The project's proposed methodology of variable density thinning is both highly controversial and highly uncertain, so an environmental impact statement is required. I would not reach whether the environmental assessment's discussion of cumulative impacts also was arbitrary and capricious.